Case number 21-6147, Kentucky et al. v. Joseph Biden et al. Oral argument, 15 minutes per side. Mr. Revesz for the appellants. Good morning, Your Honors, and may it please the Court. Joshua Revesz for the United States, and with the Court's permission, I'll reserve four minutes for rebuttal. The Procurement Act authorizes the President to prescribe policies he considers necessary to ensure an economical and efficient system for contracting. The executive order challenged here, which limited agencies to contracting only with those businesses that took certain steps to prevent workplace COVID-19 outbreaks, falls well within the Procurement Act's text and comfortably inside the decades-long understanding of Congress, the Courts of Appeals, and Presidents of both parties. So let me just stop you at the text. So we have here a statute. The statute has a purpose provision. It's entitled Purpose. The purpose of this subtitle is to provide the federal government with an economical and efficient system for the following activities. And then there's a delegation clause that allows the President to prescribe policies and directives necessary to carry out this subtitle. Now, your whole argument hinges on this subtitle including the purpose provision, right? He has the ability to carry out the purpose, not the operative provisions of the act. So I think this is a general authority under a statute, just like the general rulemaking authority the Supreme Court considered in Biden v. Mersey. Can you give me any case in which court, other than the D.C. Circuit case and the Third Circuit case here, in which a court has allowed an executive officer to carry out a purpose provision? I mean, I obviously do think that we have the cases considering this statute. Well, yeah, we have. I understand that. There are cases for this statute. Any other statute? I think the Medicare and Medicaid statutes both say that the Secretary may prescribe rules that he considers necessary to carry out the provisions of the chapter. Which means the operative provisions of the act, right? The purpose provision you concede standing alone isn't an operative provision. We're not suggesting the purpose provision alone would give the President power. Right. So you say purpose provision alone doesn't give the President power, but once he has a delegation to carry out this title, he has the power to carry out the purpose provision in addition to the operative provisions of the act. And I'm just wondering if you can give me any case that stands for that proposition. Other than the cases construing this statute, you know, which I think all come out that way, at least before this past year, I'm not sure. Again, I do think an important textual clue is the statute doesn't say he may prescribe policies necessary. It says he may prescribe policies he considers necessary. But again, considers necessary to do what? To carry out all the operative provisions that follow or the purpose provision? Well, carrying out the Procurement Act means fulfilling Congress's purpose in enacting that statute. And this is a case where Congress told us very clearly what its purpose is. And if that's wrong, then, of course, you know, at least 10 Presidents have misinterpreted the Procurement Act in promulgating executive orders. And, you know, the Supreme Court in Biden v. Missouri couldn't have been more clear that that kind of settled executive practice is very instructive as to the meaning of a statute. Well, there are two cases, right? This is not sort of, you know, Justice Frankfurt or in Youngstown, like, you know. So there are two cases, right? There's a case from the D.C. Circuit. There's a case from the Third Circuit. Spanning decades, right, from the 1970s. Like, how is that a settled administrative practice? There are a couple of more. You know, the D.C. Circuit in 2004 upheld the NLRA, the President Bush executive order, requiring that NLRA notice be posted. I think there's a Fifth Circuit case. They were bound by their own precedent. Yeah, I agree that we don't have a Supreme Court case construing the statute. I mean, I do think the weight of authority in the courts of appeals is instructive, and I do think the practice of presidents going back to President Eisenhower is instructive. It just doesn't strike me as plausible that all of those presidents, you know, Eisenhower, Kennedy, Johnson, Nixon, Carter, George W. Bush, Obama, Trump, were all reading the statute the wrong way. You know, and I agree, of course, that this order. Well, once the D.C. Circuit had arguably read it the wrong way, I mean, they would probably think they had pretty good authority, but we're not bound by what the D.C. Circuit said. So we certainly agree that you're not bound by what the D.C. Circuit said. I do think that, you know, the Supreme Court in the Biden v. Missouri case did make clear that kind of that kind of executive practice is entitled to interpretive weight, and I do think it also matters that Congress, surely being aware of the Kahn case, which was a very high-profile case at the time, you know, reenacted the Procurement Act without statutory change. So certainly they could have told us that the president doesn't have the power, that presidents of both parties have, you know, sought to express for decades. And I also think it matters that this is not, you know, this is an unusual context. It's not an Article I rulemaking type of thing. You know, this is an area where the president has inherent Article II authority to manage the executive branch, and it's not surprising that Congress would have given the president broader power to control his own agencies, you know, the only thing that this executive order does. But, of course, this order doesn't just control the agencies. It doesn't control the way that OMB will go about and the agencies will go about procuring staples. It goes about regulating the way the staples will be manufactured. You know, I don't think that's right. I think that's maybe our key difference with my friends from the other side in this case. The only thing that the executive order does is tell agencies that they cannot enter into certain contracts. They cannot enter into contracts where their counterparties will not agree to certain clauses. And, you know, that's exactly the same as the Eisenhower and the Johnson and the Kennedy orders and all the other orders we've been talking about. So I think you might be right about that they're similar, and I'm wondering what's the test. So you propose that there must be, let's say we grant you that the operative provision or the delegation clause allows them to carry out the purpose. If we grant you that, you say that the limiting principle there is there has to be a nexus. Is that like a rational basis test? What's, how do I think about how close the nexus needs to be? Yes, so the D.C. Circuit said a close nexus to economy and efficiency. And, you know, I think that's not that different probably than Arbiter and Capricious Review under the APA. And, you know, I obviously agree that this case is distinguishable from all the past practice that we've been talking about because there's a different nexus asserted here. And, you know, I think this nexus, if anything, is stronger than some of the ones that were upheld by the courts. You know, the acting OMB director concluded that workers who are not vaccinated were more likely to get sick and infect others, that workplaces where more people had COVID were likely to be less efficient than workplaces where fewer people had COVID. And I don't think that, I don't think those conclusions are meaningfully in dispute. You know, the plaintiffs here advanced another theory. There kind of be, there would be a countervailing efficiency loss because so many workers would quit their jobs. And the acting OMB director responded to that based on the evidence she had before her and concluded that that would not happen. And, if anything, that conclusion has been stronger. You know, I do think it's very significant here that the plaintiffs in this case who overlapped substantially with the plaintiffs in the Biden versus Missouri CMS case told the Supreme Court there that if the CMS mandate were allowed to take effect, hospital workers would have to quit their jobs and all of these rural hospitals would close. And the CMS mandate did take effect. It's in effect in all 50 states. And there's absolutely no evidence that that happened. You know, I don't think we need that to win this case, but I do think it matters that the OMB director made a predictive judgment that workers would not leave their job and that everything we know about what happened after. What would not be a close enough nexus? Julie, can you give me an example? I feel like you're asking for a test that's sort of like rational basis review. I mean, okay, can I make some kind of rational connection between wages or vaccines or, you know, casual Friday or any kind of workplace thing you want to do that will make workers happier and healthier? The president could probably order. Is there anything the president can't order in a contract or workplace? I think there are many things the president could not do under the Procurement Act. You know, economy and efficiency not only requires real evidence, you know, real statistical evidence that this is going to lead to efficiency gains, which I think we have here. You know, this is a market power statute, and I think it's instructive in considering what's a valid exercise of market power, what private businesses are doing. And I think that's why the acting OMB director relied so heavily on the fact that CEOs of private businesses were doing the same thing that the president, acting as CEO of, you know, the United States, decided to do in requiring vaccination of their employees. Could the president make this rule on other diseases? If they've got somebody's affidavit saying, well, a lot of people have measles and therefore everybody's got to be inoculated against measles or typhoid fever or something like that? I think the president could do that. I don't think the president ever has done that because this is a pandemic of unprecedented scope and severity that's posed, you know, unprecedented delays in the American economy. Who weighs this, whether that's got a good basis or anything like this? Does the court do that or just the president? We're not contesting that there's judicial review of the president's economy and efficiency determinations. So we absolutely agree that if the president decided to require vaccination against some other disease, you know, that would be a different case where different evidence would have to be presented and the court could reach a different conclusion. But fundamentally you're saying that under the guise of efficiency and economy, the president could theoretically impose restrictions on employees of private contractors who happen to have a government contract. You could say they can't hire anybody that smokes? You know, I don't know if they could do that because, again, that's not something private CEOs have been doing. How about if they drink? Why is it that private CEOs have to be doing it if the government can show that this is a problem and the American workforce isn't taking account of it? Under your theory, I don't know why the president can't do it. I just think it's instructive in deciding what advances economy and efficiency to see what seems like a valid exercise of market power. It seems like all kinds of things arguably advance economy and efficiency the way you're measuring it. If your workforce is more healthy, that's going to redound ultimately to the benefit of the government, right? Agreed. So if you prevent your workforce from smoking, from drinking, from using drugs, from being obese, we have an epidemic in this country of diabetes and the attendant health care costs. You could require flu shots. So you're saying, well, don't worry about it because we have to do a balancing. But you would say that all of those things would be potentially within the purview of the president. I definitely think that this is a broad power as its application to the most controversial issues of the day since the 1960s demonstrates. I think all of those examples you gave me, Judge McKee, except maybe for the flu shots, would be harder cases. Do you have a limit on the power? You still haven't identified a limit. Yes, we think the economy and efficiency test provides a powerful limit. You know, just like arbitrary and capricious review provides a powerful limit on the behavior of administrative agencies. You know, we also think that there are – I'm sorry, I see my time is up. Can I finish answering your question? We also think that there are important economical and political limits here. You know, here the president is acting as a market participant. The government needs its contractors just as much as the contractors need the government. And the government is not going to be able to negotiate contracts that the private market will not bear. And I think that's another reason not to be so worried this is a limitless assertion of power. But yes, we think the economy and efficiency test does real work. We think that the economy and efficiency findings here were very robust, much more robust than in other executive orders. And, you know, we think that provides a limit. Thank you. May it please the Court, Matthew Kuhn for the Appellee States, Kentucky, Ohio, and Tennessee, as well as the two Ohio sheriffs. Earlier this year, the Supreme Court told us that OSHA could not mandate the COVID-19 vaccine for millions of workers based on a workplace safety statute. If a workplace safety statute is not enough for a far-reaching public health measure, neither is a statute governing federal procurement. Yet here, that is what the government relies on. A benign gap filler provision in a procurement statute passed shortly after World War II, and they rely on that to mandate the COVID-19 vaccine for one-fifth of the workers in our country. The text of the statute at issue here, the Procurement Act, is not the expansive font of authority that the federal government claims. Judge Larson, as you noted during my friend's argument, essentially the federal government here makes several errors, the first of which is making a purpose provision into an operative provision. At best, even if you disagree with that, at best the statute allows the policy to prescribe policies governing the federal government's system for procuring non-personal services. Imposing a vaccine mandate has nothing to do with that inward-facing system, as the state panel held. I think your counsel on the other side would say, well, if you have any standard contract term, that will make the system more efficient. Rather than having all the multiple agencies have to negotiate a standard contract term, or individual contract terms, we just have standard contract terms, and that makes things more efficient. Two responses. The first is a legal one, and then I'd like to give an example to try to tease that out. I think that my friend's argument is collapsing the difference between a standard for procuring non-personal services, what we have here, with a system for procuring non-personal services, with a system for producing or providing those services. I think those are two distinct things. If I can give an example to help the court tease that out, assume the court hires me to help improve your process for hiring clerks. If you hired me to do that, no one would say that I then have a mandate to tell you what qualities you have to look for in hiring clerks. If I were hired to improve your process, I'd be working on OSCQR, making sure that you're getting recommendations, that your deadlines are put out, that you're speaking, that you're telling clerks when you're full. That's what improving the process connotes. It's not sort of a substantive thing of telling contractors what they have to do, and then telling employees of contractors and subcontractors what they have to do. So I think system, as the state panel held, is a limiting principle to what the president is authorized to do under the statute. So even if you disagree with me on your question, Judge Larson, of my friend about the purpose provision, even if you disagree with me on system, we then have to get to the Kahn case. We agree that the D.C. Circuit has read the statute a bit more broadly, and Kahn is really the federal government's only authority in this regard. The Chao case that followed it in 2004 was bound by it and applied it. But I'd point out that Kahn expressly disclaims any suggestion that the Procurement Act justifies whatever measure, whatever measures the president deems to be economical and efficient. There are two separate opinions to Kahn that disclaim that. If you look at footnote 50 of the Kahn decision, they emphasize the narrowness of it. As the court's already asked about, what is the limiting principle to the federal government's assertion of authority? To give you an example, Judge Van Tatenhove said in his order, if the federal government is right, what's to stop them from saying that we don't want to contract with federal contractors who hire employees above a certain body mass index? That's what Judge Van Tatenhove said when the federal government got on appeal. They've not disclaimed that power. The state panel said, under your assertion of authority, the president could tell employees of contractors to wear masks at family gatherings. When the state panel said that, they've not disclaimed that. The most they've done is page 13 of their reply brief and said, the president hasn't done that. Well, that's not to say he couldn't do that. The limiting principle we've heard this morning is that if CEOs of private companies are doing this, then maybe that's the limiting principle. I don't understand how that limiting principle is based on anything in the text of the Procurement Act. What's your best Supreme Court basis for your position in this case? It would be easier if we could go from there down. This case would be a lot easier if the Supreme Court had told us what economy and efficiency means. That's not to say that they haven't said anything. There's been some discussion. The Chrysler Corp. v. Brown case is, as I understand it, the only time the U.S. Supreme Court has looked at the Procurement Act. And that's 441 U.S. 281. And that dealt with the Procurement Act as it relates to some of these anti-discrimination orders that my friend was discussing. Footnote 34 of Brown does not resolve whether those anti-discrimination orders are justified. But footnote 34 says, quote, nowhere in the act is there a specific reference to employment discrimination. So I think that was Justice Rehnquist at that time pointing out perhaps the problems with the broad textual argument that exists in cases like Kahn and the Contractor Association case that you mentioned from the Third Circuit. Can we shift to irreparable injury for just a moment? So the argument here is that the plaintiff states and maybe Tennessee in particular will be prevented from enforcing their laws if the mandate is not enjoined to parties beyond those before the court. Can you explain that? Because I'm not sure. I guess one question is, can a condition in a federal contract really ever preempt a state law? So if you look at the guidance documents, there is a statement that it would preempt contrary state law. So that is in the federal government. They're purporting to preempt. Purporting to preempt. And Tennessee, at the time we filed this case, had a law that said essentially no government official by executive order or local ordinance, etc., shall mandate vaccines. Shortly before a preliminary injunction was granted, the state of Tennessee broadened that statute to make it much more broadly banning vaccine mandates for workers. And so that statute, under the federal government's view, would be preempted as I read the guidance. And so we've got sort of a direct incursion on Tennessee's sovereignty there. But you have three states here, and all of us have the authority to regulate our citizens' health and safety. Kentucky, for example, our legislature has enacted numerous provisions with respect to the COVID-19 crisis and has not mandated vaccines. We've exercised our sovereignty in a way that we're not going to mandate vaccines. It's going to be a personal choice for our citizens. And that sovereign decision, which is... Right, but you're leaving the playing field open. I mean, Tennessee might be a different case, but you're saying employers can mandate or not mandate if they choose. And when the employer decides to take a federal contract, why aren't they just making a choice? But then... So Tennessee's different, as the question assumes. Bracket Tennessee for a moment. But, for example, in Kentucky, the government has not enacted a measure that says if you're... Kentucky state government, of course, is a federal contractor. And so this is forcing Kentucky state government to mandate vaccines on government employees when our legislature has not required that. And we think that is an incursion on our sovereignty. Can't you just choose not to contract with the federal government, then? Sorry, I didn't hear the first part of your question. Can't you just choose not to take the contract? I mean, I understand. Maybe you want to argue it's coercive, NFIB, something like that. But it's a contract. So I agree with you that it's a contract. I think I've got two responses to that, if I can. The first one is that what we're doing here is statutory interpretation. The fact that there's a contract that's involved, that there may be some element of choice, that doesn't change the ordinary rules of the road in contract interpretation. The second point that I would make is sort of the coercion point that you mentioned. If you look in the record at page ID 949, after the president announced this vaccine mandate, the president of the University of Louisville sent out an email to everyone at the University of Louisville announcing that they would be following the federal contractor vaccine mandate. And as she explained it, she said, quote, due to multiple federal contracts and agreements, our university depends on for operation. The University of Louisville will be following the federal contractor vaccine mandate after we got the preliminary injunction. They walked that back. But my point is, we're talking about the federal government. One in five American workers work on these contracts. And the notion that there's some free choice when you've just got this massive amount of market power, I think the free choice with respect to that is a bit illusory. My friend talked a little bit about the government acting as proprietor, that this is just contracting. I want to take that on directly. That argument may have a bit more meaning if the federal government was saying, if you want to contract with the CDC and work on viruses, we're going to require the COVID-19 vaccine. That's more of a proprietor argument. But this vaccine mandate is so broad that it goes beyond that, that it's trying to compel individual contact. Think about who's covered by this. So people that work on federal contracts, of course are covered. But people that work entirely outside on federal contracts are covered. People that work from home are covered. And even if you're not working on a federal contract, but you might run into someone working on a federal contract in a break room, in a parking garage, you've got to get vaccinated as well. And so the scope of the federal contract or vaccine mandate suggests to us that this is not about proprietary authority. This is about changing private conduct. This is regulatory. That's sort of a pretext argument you're making. I think it is a pretext argument. It's a type of a pretext argument. And we pointed out in our appellee brief that there are two D.C. Circuit cases, the Chow case being one of them, that talk about when you're regulating across the board, even as to contracts, when it's so broad that it affects so many people, that you're not really implicating the propriety power of government. This is, in fact, regulatory. The one thing that we haven't mentioned yet, if I can just mention quickly, the major questions doctrine and the federalism canon, as the state panel pointed out, play some role here. I don't think the court has to get to those if you think the text is clear that the federal government cannot do this. But if there's some ambiguity, then I think you have to get to those clear state mechanics. They argue major questions doctrine doesn't apply because this is a delegation to the president and the president is accountable. Do you want to speak to that? Sure. I think West Virginia v. EPA puts that to bed. The Chief Justice told us that the justification for the major questions doctrine is the separation of powers and a practical understanding of legislative intent. That was cited in our 28J. So it's an Article I problem no matter to whom they're delegating an Article II? Correct. If an agency is acting on a major question as in West Virginia v. EPA, or here the president is acting on a major question, that's still a separation of powers problem because you've got the legislative power here, the spending power. That's a congressional power that's being delegated so you still have the separation of powers problem. The major questions doctrine is about fortifying the legislative power and the power here reduces to the legislature. It's spending power. They haven't cited any case that would suggest the major questions doctrine does not apply here. The state panel applied the major questions doctrine in the event that there was some ambiguity in the text. I don't understand how economy and efficiency, that broad language, how that can be understood to clearly authorize this. The final point that I'll make in my last two minutes is even if you disagree with everything I've said, even if you agree that you should apply the CON standard, I still think we went under CON. If you look at the president's prior policies that have been undertaken under the authority of CON, as the state panel noted, these are express work-anchored provisions. CON dealt with price and wage controls. CHAL dealt with posting notices for workers. The Napolitano case, the District of Maryland case they cited, that dealt with using E-Verify to look into your employee's immigration status. All of those have a very tight connection to work. None of them dealt with a medical procedure and all of those requirements applied only on the contractor itself. Did not require their employee to do something different. Has the federal government ever mandated other kind of diseases besides this one? As you can recall, like typhoid or smallpox or anything like that. That's certainly not been discussed on these papers. There's nothing further we'd ask that the district court's preliminary injunction be affirmed. Thank you, Your Honors. We'll hear rebuttal. Thank you, Your Honors. Let me try just to make a couple of quick points. First on the word system, we don't dispute the state panel's conclusion that system points the court's analysis inward. Again, we just think that the only thing that is being done here is directing agencies what they should be doing. We're not asserting that the Procurement Act is what's giving the agencies power to negotiate contracts. Agencies have that power inherently. All the Procurement Act is doing here is letting the President tell agencies that they may not enter into certain contracts that they ordinarily would. And we think that's entirely... So it's setting the terms of the contracts that the agencies can write. It's barring agencies from entering into contracts that don't contain certain terms. Or mandating certain terms, right. So it's a substantive provision, though. I mean, it's a substantive term that operates on the contractors themselves. It's the agencies that are proposing that substantive term. It's not the President. The agencies are proposing that in all of their contract negotiations. In a formal way. But I do think that's significant because the agencies don't need statutory authority to negotiate contracts. The government has the inherent power to enter into contracts. There's no statute that says DOD may require the stealth planes to fly at 600 miles per hour rather than at 500 miles per hour. The agencies are doing that all by themselves. This is just the President telling agencies you must take off the table some contracts that you otherwise would want to enter into. And I do think that, while potentially a formal point, it's an important point for this case. I also just want to talk about the major questions doctrine for a minute. I think there are two important reasons why it doesn't apply. The first is, as the Court noted in the West Virginia case, it's new assertions of authority in long-existent statutes that particularly raise major questions concerns. Whereas here we have this lengthy history of the application of the major questions doctrine to the most consequential issues of the day. Anti-discrimination in the times of President Eisenhower, Johnson, and Kennedy were much more significant than what we're talking about here. And I think if the major questions doctrine were to apply in this case, it would have been liquidated by that past practice. And we also do think it's significant that this is an area where the President wields inherent Article II authority. You know, as a matter of both a practical understanding, and for all the reasons that Justice Gorsuch joined what Justice Alito gave in his West Virginia concurrence, the major questions doctrine is about protecting Congress's Article I authority. Where the executive has inherent Article II power, as here, where the President has authority to tell his own agencies what to do, there's much less reason to think that Congress would not have delegated in broad terms. But you don't think that Congress lacks the authority to pass this provision impeding on the President's inherent authority to procure supplies? Well, certainly not. We think the Procurement Act confirms the President's broad Article II powers to manage his own workforce. And it's the fact that it's... So any limit that they would, that Congress would put on it would be unconstitutional? No, we're not arguing that it's that kind of Youngstown case. You know, this is a Youngstown-type case where Congress and the President are marching hand-in-hand. They both think that the President should have broad power to manage his own workforce and to direct his own agencies what to do. And therefore, I think we can avoid the hard questions of what Article II, standing by itself, would and wouldn't permit. I think the mere fact that there's an important Article II backdrop here is good enough for major questions purposes. And the evidence that Congress wants the President to have this broad authority is the purpose provision. I mean, that's all you've got. And the reenactment of the Procurement Act after all of these consequential executive orders. And, you know, to close, I guess, Judge Sullivan, if I could just go to your question. You know, I think this is in some ways a case about matching up the Supreme Court's two vaccine cases from this term. Is this more like the OSHA case? Or is it more like the Biden v. Missouri case? You know, I think I've tried to give you some reasons today why it's more like the Biden v. Missouri case. It's more like the Biden v. Missouri case because there's this history. The history is very important to the Court in that case. You know, this is not an example of an agency kind of doing something that's well outside as the Supreme Court found in the OSHA case of its statutory mission. Rather, the President is charged with ensuring that the American citizens get a good deal from the government. And the President here concluded, and in our view, the evidence confirms that requiring common-sense steps to prevent workplace COVID-19 outbreaks is what was necessary to provide the American worker the American citizen that good deal. So for those reasons, we'd ask that the judgment below be reversed. Thank you. Thank you. We'll give you a minute to switch tables and then the clerk can call the next case.